THE DEPARTMENT OF CORRECTIONS, Plaintiff-Appellant, v. CHARLES CLAY, Defendant-Appellee.

Fifth District   No. 5—84—0201

Opinion filed March 5, 1985.—Modified opinion filed on denial of rehearing August 6, 1985.

KARNS, J., dissenting.

Gregory Collins, of Stratton & Nardulli, of Springfield, for appellant.

Mary C. Rudasill and Treva H. O'Neill, both of Rudasill & O'Neill, of Carbondale, for appellee.

JUSTICE WELCH delivered the opinion of the court:

This is an appeal from the judgment of the circuit court of Johnson County on administrative review of a decision of the Illinois Human Rights Commission. An administrative law judge found that defendant Charles Clay had been discriminated against on the basis of race in that his employer, plaintiff Department of Corrections (DOC), had discharged Clay while not properly investigating the culpability of white employees arising out of the incident culminating in Clay's dismissal. The Human Rights Commission adopted as its own the decision of the administrative law judge and awarded Clay back pay and attorney fees. The circuit court affirmed the decision of the Human Rights Commission. This appeal followed. We reverse.

On September 21, 1979, Clay was a correctional counselor assigned to the staff at Vienna Correctional Center, a minimum security institution. The administration building at Vienna encloses a center courtyard. Various offices have windows with a view of the courtyard, as does the visiting room. An officer is assigned to visiting room duty. However, that officer has other duties as well and is not posted within the visiting room. Instead, that officer walks through the visiting room at intervals which vary. Other officers are also expected to walk through the visiting room when in the vicinity. A meal relief officer is assigned to fill in for officers, including the visiting room officer, who are on meal breaks. The visiting room is visible to some extent from the offices across the courtyard, and security officers sometimes conduct surveillance of the visiting room from those offices. On September 21, 1979, at about 5:40 p.m., counselors Clay and George McNeil, both of whom are black, were in McNeil's office waiting for their shift to end at 6 p.m. Christopher Post, a resident, called Clay to another office, where Clay witnessed what appeared to be an act of sexual intercourse between a resident (Cornille) and a visitor, a girl about age 12, in the visiting room in the presence of Cornille's wife. The act of

intercourse continued about two minutes while Clay watched. During that time, McNeil came to where Clay was watching; McNeil looked out the window at the visiting room briefly, then left the office. Resident Williams also arrived and watched. Clay left to assist a resident. Security Lieutenant Richard Astin arrived, ejected Williams from the office and departed. Clay then heard resident Lawrence Johnson say that oral sex was now being performed. Clay witnessed part of this act, between Cornille and his wife, though he saw neither the beginning nor the end of it. Astin and Sergeant Cheek, in the hallway, observed residents Johnson and Alphonso Hall leaving the office. In response to Cheek's inquiry, Clay told Cheek to look out the window. However, the activity had ceased and the visit concluded. Clay told Cheek that Cornille had been having sex with his visitors. Cheek reported to Captain James Bowen, who summoned Clay. On the way, Clay was stopped by Cheek and divulged the full details of his observations for the first time. This merely confirmed what Cheek had already been told by resident Post.

Clay verbally described his observations to Captain Bowen, the latter telling Clay he would have to write a report and replying yes when asked by Clay whether he would have to sign it. Ensuing proceedings resulted in Clay's presence at Vienna some 2½ hours beyond the end of Clay's shift. Captain Phillip Huff, who had finished his normal work hours, was summoned from home and began his investigation. Various individuals were interviewed by Huff and their statements tape-recorded. Clay gave a written report that night as well. Those interviewed by Huff, either that night or soon afterward, included security officers Cheek, Astin, and Bowen (all of whom were interviewed together); counselors Clay and McNeil; residents Post, Johnson, Hall, and Williams; and Cornille and his wife. The latter two admitted the latter sex act described, but denied the former sex act involving Cornille's stepdaughter. Officers Marvin Eckenberg and John Lewis, respectively visiting room officer and meal relief officer at the time in question, each replied in the negative when asked by Bowen whether they had seen anything unusual. At the time of Huff's final report, he had not ascertained who the visiting room and meal relief officers were at the time in question, though he had been assured by Bowen that no security officers had witnessed the incidents.

Huff, in his written report, recommended polygraph examinations of Clay, McNeil, and Post, and indicated that Clay was in violation of his duty to report for not having reported until confronted. After an employee review hearing, Clay and McNeil were discharged. Clay

sought review of this decision before the Illinois Civil Service Commission, which confirmed the discharge, finding Clay guilty of violating DOC regulations and of severe and gross negligence. Clay sought administrative review in the circuit court of Sangamon County, which affirmed the decision of the Civil Service Commission.

While proceedings were pending before the Civil Service Commission, Clay filed his complaint with what is now the Illinois Department of Human Rights, alleging that his discharge was based on racial discrimination. The Department of Human Rights filed its own complaint on Clay's behalf with the Illinois Human Rights Commission. During hearings before an administrative law judge, said complaint was amended to allege that the DOC had discriminated against Clay by discharging him for violating regulations while not properly investigating the culpability of white employees.

The administrative law judge recommended that Clay be awarded back pay and that certain pertinent documents be destroyed or sealed from the public. The Human Rights Commission, with certain reservations regarding the administrative law judge's statements as to the appropriate burden of proof, adopted the administrative law judge's decision as its own. The DOC sought administrative review in the circuit court of Johnson County. With minor exceptions not pertinent here, the circuit court affirmed the decision of the Human Rights Commission.

The DOC argues that the Human Rights Commission was estopped from finding various facts contrary to the findings of the Civil Service Commission; that Clay did not prove a *prima facie* case of racial discrimination; that Clay did not prove that the reason given for his discharge was pretextual; that the Human Rights Commission was not authorized to award back pay without reinstatement; and that Clay was discharged for good cause. We need consider only one of these issues. We agree with the DOC that Clay failed to prove a *prima facie* case of racial discrimination and that the evidence adduced was not sufficient to support the decision of the Human Rights Commission to the contrary.

■■■ Under the Illinois Human Rights Act it is a civil rights violation for any employer to act with respect to, *inter alia*, discharge, discipline, privileges or conditions of employment on the basis of a person's race or color. (Ill. Rev. Stat. 1983, ch. 68, par. 2—102(A).) We presume, as do the parties, that the analysis of a discrimination claim under the Illinois Human Rights Act should be similar to the analysis of a claim under title VII of the Civil Rights Act of 1964 (42 U.S.C. sec. 2000a *et seq.* (1976)). (See *Freeman United Coal Mining Co. v.*

*Fair Employment Practices Com.* (1983), 113 Ill. App. 3d 19, 22, 446 N.E.2d 543, 545.) A three-step analysis of the allocation of the burden of proof in a title VII case has been formulated by the United States Supreme Court: (1) the claimant must make out a *prima facie* case of discrimination; (2) at this point, the opponent assumes the burden of producing a reason for its actions which is, on its face, legitimate and non-discriminatory; (3) it is then incumbent on the claimant to carry his continuing burden of proof that he was, in fact, the victim of discrimination. (*Freeman United Coal Mining Co. v. Fair Employment Practices Com.* (1983), 113 Ill. App. 3d 19, 446 N.E.2d 543; see *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 67 L. Ed. 2d 207, 215, 101 S. Ct. 1089, 1093-94.) In this appeal we must presume the findings and conclusions of the Human Rights Commission on questions of fact to be *prima facie* true and correct. (Ill. Rev. Stat. 1983, ch. 110, par. 3—110.) Accordingly, this court will not disturb the findings of the Human Rights Commission on issues of fact unless such findings are contrary to the manifest weight of the evidence. *Eastman Kodak Co. v. Fair Employment Practices Com.* (1981), 86 Ill. 2d 60, 76, 426 N.E.2d 877, 884.

▮ It must be emphasized at this point that while Clay initially alleged that his discharge was discriminatory, his proof failed as to this allegation. He was awarded relief on the basis that he had proved that Huff's investigation was discriminatory. We have found no cases involving proof of a *prima facie* case of discriminatory investigation. However, in order to prove a *prima facie* case of racial discrimination involving discharge for violation of work rules, the claimant must first demonstrate by a preponderance of the evidence either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly. (*Green v. Armstrong Rubber Co.* (5th Cir. 1980), 612 F.2d 967, 968.) As Clay alleged discriminatory investigation by Huff of violation of work regulations, Clay should have been required to prove either that there was no substantial information of which Huff was aware indicating that Clay committed the violations he was charged with, or that, if there was such information, white employees regarding whom such information was also available were not investigated similarly. Clay's proof established neither of these positions. Clay argues, instead, that a *prima facie* case of discrimination was established by his showing that the DOC did not sufficiently investigate whether other employees committed similar acts or omissions or failed to discharge their duties to observe the visiting room. We disagree. In *Chicago-Allis Manufacturing Corp. v. Fair Employment Practices Com.* (1975), 32 Ill. App. 3d 392, 336

N.E.2d 40, the court rejected the claimant's contention that the plant superintendent had inadequately investigated an altercation between the claimant and his superior where the superintendent interviewed the claimant's superior and the claimant's union representative (who also witnessed the altercation) but did not interview the claimant or his co-workers. In the instant case the sole DOC employees alleged to have been either (1) assigned to duties including visiting room observation, or (2) in a position to observe the visiting room at the pertinent time (other than Clay and McNeil) are Eckenberg, Lewis, Cheek, and Astin. Unlike Clay, who at all times admitted having viewed the visiting room incident without attempting to alert security, each of the four security officers consistently provided innocent explanations of their behavior: Cheek and Astin told Huff they were watching resident Hollowell, whom they suspected of receiving contraband from his visitor; Eckenberg and Lewis simply told Captain Bowen they had failed to note anything unusual. These innocent explanations were never contradicted to Bowen or Huff, so far as Clay's proof reveals. We believe that Bowen and Huff were entitled to rely on these uncontradicted reports and were not required to conduct an extended witch-hunt by the mere fact that Clay, an admitted wrongdoer from the start, was a member of a group protected by the Illinois Human Rights Act. If the legislature intended to confer such an onerous burden on employers, the Human Rights Act does not plainly so state. It is for the legislature, not this court, to impose such a requirement.

■ Two persons whose culpability was, according to the evidence, greater than Clay's were the Cornilles. The administrative law judge expressly noted in support of her finding of discriminatory investigation that the DOC "made little effort to build a case for discipling [sic] these white adults." This critical finding was contrary to the uncontradicted evidence before the administrative law judge: Cheek and Astin testified that upon leaving the visiting area resident Cornille was immediately shaken down and taken to segregation. There, he was stripped and examined and his clothing was locked up. According to Huff, Cornille's undershorts, suspected of being semen-stained, were delivered to the DeSoto crime laboratory. Warden Mizell testified that the institution's investigation reports were turned over to the Johnson County State's Attorney. Huff testified that to his knowledge the Cornilles were not prosecuted, but that the DOC had no authority to direct the State's Attorney to do anything. Huff's opinion in this regard is consistent with Illinois law. (See Ill. Rev. Stat. 1983, ch. 14, par. 5(1); *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 397 N.E.2d 809, 814, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788,

100 S. Ct. 1603.) Clay testified that, four days after the visiting room incident, he was interviewed again by Huff, this time in the presence of a representative of the Department of Children and Family Services. Based on the foregoing, we find no support of record for the administrative law judge's conclusion that the DOC "made little effort" with respect to prosecuting the Cornilles. While it is primarily the function of the administrative agency to determine matters of credibility of witnesses (see *Cartwright v. Civil Service Com.* (1980), 80 Ill. App. 3d 787, 400 N.E.2d 581, 586), positive testimony, uncontradicted and unimpeached, may not be disregarded by the trier of facts (*Urban v. Industrial Com.* (1966), 34 Ill. 2d 159, 214 N.E.2d 737, 739).

Clay also suggests that McNeil's discharge somehow supports the conclusion that the investigation was discriminatory. However, it is uncontradicted that resident Post told Huff that McNeil looked where he (Post) looked and must have seen what he saw. This statement by Post contrasts neatly with Post's statement that "the Lieutenant" (apparently, Lieutenant Astin) was looking out a window, a statement entirely consistent with Astin's statement that he was conducting surveillance on Hollowell. Cheek's testimony that the entire visiting room could not be viewed from any one office is unrebutted. Thus the fact that the only two black employees in the vicinity were investigated appears attributable to uncontradicted statements by Clay and Post rather than any conceivable racial animus.

Counsel for Clay at oral argument seeks to persuade this court that the timing of the alleged sex act involving the child, approximately two minutes, justifies the conclusion by Clay that he could do nothing to intercede from across the building. We fail to see the relevance of this point in view of Clay's ultimate contention, not that he was discriminatorily discharged, but that he was discriminatorily investigated. Parenthetically, we also fail to see how Clay could anticipate the brief duration of the event while it was yet ongoing.

■■ ■ Clay argues, *inter alia*, that once the administrative law judge had found that Clay had proved a *prima facie* case of discrimination, the issue whether a *prima facie* case had been proved was moot, and this court should consider only the ultimate issue of discrimination or not. (See *United States Postal Service Board of Governors v. Aikens* (1983), 460 U.S. 711, 713-15, 75 L. Ed. 2d 403, 409-10, 103 S. Ct. 1478, 1481-82.) We do not disagree with the proposition that it is the administrative agency's ultimate determination of discrimination which is on review here, not the administrative law judge's conclusion that a *prima facie* case had been proved. Consider-

ation of whether a *prima facie* case was proved is, on appeal, no more or less than a useful framework for analysis of that ultimate determination. The elements of the *prima facie* case are matters which the claimant must prove, at a minimum, to support his claim for recovery. Absent such proof, the claimant has not made out a case of discrimination, and the ultimate determination of discrimination cannot stand.

For the foregoing reasons, we conclude that Clay failed to prove a *prima facie* case of racially discriminatory investigation and that the judgment of the circuit court of Johnson County affirming the decision of the Human Rights Commission must be reversed.

Reversed.

JONES, P.J., concurring.

JUSTICE KARNS, dissenting:

I believe that Clay proved a *prima facie* case of racial discrimination, which, if rebutted by the articulation of a nondiscriminatory reason for discharge, was then established to be pretextual (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817), and the findings and decision of the Illinois Human Rights Commission were not against the manifest weight of the evidence. *Eastman Kodak Co. v. Fair Employment Practices Com.* (1981), 86 Ill. 2d 60, 426 N.E.2d 877.

Clay and McNeil, both black, are the only employees punished for the sordid breach of security at the Vienna Correctional Center. Neither Clay nor McNeil, correctional counselors, were assigned specific security duties. One wonders what the numerous white security officers, whose duties included the prevention of just such an occurrence in the visiting room, were doing while these activities took place. We shall never know, however, as the investigation under Captain Huff never focused on the activities of the security staff in any meaningful manner to determine its culpability by what it did or failed to do. The decision of the Human Rights Commission, affirmed on administrative review by the circuit court of Johnson County, that the investigation and discharge of Clay was pretextual and racially motivated, is amply supported in the evidence and detailed findings of fact.

It is no defense that Clay's conduct was considered to warrant discharge by the Civil Service Commission if it were merely a racially motivated pretext for discharge. *McDonald v. Santa Fe Trail Transportation Co.* (1976), 427 U.S. 273, 49 L. Ed. 2d 493, 96 S. Ct. 2574.