QUINCY SCHOOL DISTRICT NO. 172, Petitioner, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents.

Fourth District   No. 4—89—0257

Opinion filed April 24, 1990.—Rehearing denied June 22, 1990.

McCULLOUGH, J., dissenting.

Keefe, Gorman & Brennan, of Quincy, for petitioner.

Walter D. Braud and Duane Thompson, both of Braud/Warner, Ltd., of Rock Island, for respondent James T. Mallory.

Neil F. Hartigan, Attorney General, of Springfield (Robert Ruiz, Solicitor General, and Tanya Solov, Assistant Attorney General, of Chicago, of counsel), for respondent Human Rights Commission.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Quincy School District No. 172 (School District) discharged complainant James Mallory (Mallory) from his position as a custodial supervisor in 1984. The School District maintains Mallory was terminated because he was insubordinate and made threats against his supervisor and a co-worker. Mallory claims he was fired because he is black.

Mallory filed a discrimination charge with the Illinois Department of Human Rights (Department) on September 4, 1984. The Department filed a complaint on his behalf on April 30, 1986, alleging the School District discharged him because of his race. The administrative law judge (ALJ) concluded the School District discriminated on the basis of race and ordered reinstatement, back wages and benefits, attorney fees, and costs. A three-member panel of the Human Rights Commission (Commission) affirmed the ALJ's decision on December 6, 1988. (*In re Mallory* (1988), ____ Ill. HRC Rep. ____ (HRC No. 1985SF0090).) The full Commission denied the School District's petition for rehearing, and the School District timely filed a notice of appeal. On appeal the School District argues the findings of the ALJ were against the manifest weight of the evidence and Mallory had not proved disparate treatment. We disagree and affirm the decision of the Commission.

The ALJ made the following findings of fact. Mallory worked initially at the old senior high school building, which was later renovated and became Baldwin Intermediate School (Baldwin). Mallory was assigned to work at Baldwin during the spring of 1983. Robert Moore (Moore) was principal at Baldwin and Mallory's supervisor. The two had not worked together before. Thomas Gott (Gott), assistant superintendent of schools, was Moore's supervisor. Without consulting Mallory, Gott assigned custodians to work under Mallory's supervision at Baldwin.

Michael Blunt (Blunt), the son of a former principal for the School District, was assigned as a custodian at Baldwin. Blunt has a learning disability and works at a slower pace than other custodians.

He requires frequent attention and must be reminded often of changes in his work routine. He does not adjust well to variations in the routine. Blunt sometimes could not complete assignments during regular work hours.

Mallory occasionally lost his temper with Blunt due to deficiencies in Blunt's work performance. Mallory often raised his voice and used profanities, often causing Blunt to "freeze up," becoming unable to respond. Moore spoke with Mallory several times during the 1983-84 school year about his treatment of Blunt, encouraging Mallory to treat Blunt more gently and not to use profanity or to raise his voice.

Mallory's problems were exacerbated by Moore's practice of changing Blunt's work assignments without informing Mallory. Blunt performed the tasks specified by Moore and left Mallory's assignments incomplete. When confronted by Mallory regarding his failure to complete assigned tasks, Blunt could not respond. These confrontations occurred throughout the school year.

Among the custodians Mallory supervised were Michael Oberdalhoff (Oberdalhoff) and Floyd Hively (Hively). Mallory believed each man was prejudiced against him and conspiring with Moore against him. The latter belief was fostered in part by meetings Moore held with Oberdalhoff and Hively from which Mallory was excluded.

At one point Oberdalhoff and Hively refused to follow Mallory's orders. Mallory sought to issue written reprimands to each. Gott advised Mallory to write the letters, which he did, but Moore refused to sign them. Mallory finally issued a letter of reprimand to Oberdalhoff bearing only his signature.

Mallory returned to work on August 20, 1984, following a three-week vacation. Moore altered Blunt's work schedule that morning without telling Mallory. Mallory confronted Blunt about the incomplete assignments he made. Mallory raised his voice and used profanity during this confrontation. Rosie Foster (Foster), Moore's secretary, observed the incident and reported it to Moore. Moore arrived on the scene shortly thereafter and took Mallory into Mallory's office. Both men were angry. Moore reminded Mallory he was the boss and had asked Mallory to treat Blunt more gently. Moore then informed Gott of the confrontation between him and Mallory. Gott indicated he was willing to recommend discharge at that time, but Moore asked for additional time to work with Mallory.

Moore went to Gott the following day and informed him of threats made by Mallory against him (Moore) and Foster. Mallory had allegedly made the threats in the presence of Oberdalhoff and

Hively, though Moore could not remember who informed him of the threats. Moore told Gott he was ready to recommend discharge. Gott and Moore, with the support of Oberdalhoff and Hively, asserted the threats had been made and recommended to the school board that Mallory be discharged, for having made the threats and for insubordination. The decision to discharge was made before Mallory was questioned about the threats. The school board discharged Mallory in accordance with the recommendation.

We now turn to the first issue, whether the findings made by the ALJ were against the manifest weight of the evidence.

The ALJ found Mallory never made threats of violence against Moore or any other school employee. The ALJ concluded Mallory's only offense was insubordination. He commented, "It would be speculation to suggest there was a conspiracy among Moore, Oberdalhoff, and Hively. Nonetheless, the testimony and their demeanor leads me to believe that none of them was being honest when claiming that the threats had been made or that they believed the threats to have been made."

The School District argues this finding is not supported by the record or by logic. Moore must have believed Mallory made the threats, according to the School District, because he stationed a security guard outside his office while he and Gott discussed Mallory's discharge with Mallory. Further, Moore agreed to terminate Mallory only after he learned of the threats, rather than after the incident with Blunt on August 20.

The School District cites *Oakdale Community Consolidated School District No. 1 v. County Board of School Trustees* (1957), 12 Ill. 2d 190, 145 N.E.2d 736, as support for its argument that this court must set aside the order of the Commission. "The rule which accords a *prima facie* validity to administrative decisions does not relieve a court of the important duty to examine the evidence in an impartial manner and to set aside an order which is unsupported in fact." (*Oakdale School District*, 12 Ill. 2d at 195, 145 N.E.2d at 738.) The School District did not include the remainder of this paragraph in which the court went on to state: "Our Administrative Review Act does not require judicial recognition of an order which is against the manifest weight of the evidence, 'nor does the law allow a stamp of approval to be placed on the findings of an administrative agency merely because such agency heard the witnesses and made the requisite findings.' " (*Oakdale School District*, 12 Ill. 2d at 195, 145 N.E.2d at 738, quoting *Drezner v. Civil Service Comm'n* (1947), 398 Ill. 219, 231.) The School District also argues that because the testi-

mony of Moore and Gott, that they believed the threats, was not contradicted, the ALJ should not have disregarded their testimony. In a 1981 paternity case the Illinois Supreme Court stated:

"While we agree that the credibility of witnesses and the weight to be accorded their testimony are typically jury considerations [citations], a jury cannot arbitrarily or capriciously reject the testimony of an unimpeached witness [citations]. Where the testimony of a witness is neither contradicted, either by positive testimony or by circumstances, nor inherently improbable, and the witness has not been impeached, that testimony cannot be disregarded even by a jury." (*People ex rel. Brown v. Baker* (1981), 88 Ill. 2d 81, 85, 430 N.E.2d 1126, 1127.)

The case was later cited by the supreme court in *Ferretti v. Department of Labor* (1987), 115 Ill. 2d 347, 353, 506 N.E.2d 560, 562, an appeal from an administrative agency decision.

■ The order issued by the ALJ indicates he did not disregard any of the testimony. Instead, he weighed the credibility of the witnesses and found Mallory more credible than Moore, Gott, Oberdalhoff, and Hively. The Commission adopted this credibility determination. "Findings of fact [made by the Commission] are entitled to deference, and this is particularly true of credibility determinations." *Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 180, 545 N.E.2d 684, 688.

Finally, the School District maintains that the prejudices of Oberdalhoff and Hively are irrelevant, as only Moore and Gott had authority to implement procedures which would lead to discharge. Arguably the prejudices of Oberdalhoff and Hively are important to the extent they may have motivated the men to manufacture the threats which, if believed, would lead to the discharge of their supervisor. The ALJ found, however, that Moore did not believe threats were made and so we agree the prejudices of Oberdalhoff and Hively are irrelevant.

■ Mallory contends the real issue is whether the ALJ's finding that his testimony was more credible than that of Moore and Gott is against the manifest weight of the evidence. Mallory views the School District's position as a request for this court to reweigh and reevaluate the evidence.

"It is well settled that the factual findings of an administrative agency are deemed *prima facie* true and correct and the agency's decision based thereon may be disturbed by a court sitting in administrative review only where that decision is

contrary to the manifest weight of the evidence. [Citation.] A decision is contrary to the manifest weight of the evidence only when, after reviewing the evidence in a light most favorable to the administrative agency, the court determines that no rational trier of fact could have agreed with the agency's decision [citation], because an opposite conclusion is clearly evidence [*sic*]. [Citation.] If the record contains any evidence supporting the administrative agency's decision, the decision must be sustained on review." (*Bultas v. Board of Fire & Police Commissioners* (1988), 171 Ill. App. 3d 189, 193-94, 524 N.E.2d 1172, 1174-75.)

(See also *State v. Human Rights Comm'n* (1989), 178 Ill. App. 3d 1033, 534 N.E.2d 161; *Acorn Corrugated Box Co. v. Illinois Human Rights Comm'n* (1989), 181 Ill. App. 3d 122, 536 N.E.2d 932; *Burnham City Hospital v. Human Rights Comm'n* (1984), 126 Ill. App. 3d 999, 467 N.E.2d 635.) The reviewing court cannot reweigh the evidence or substitute its judgment for that of the Commission. *Zaderaka*, 131 Ill. 2d at 180, 545 N.E.2d at 688; see also *Acorn Corrugated Box Co.*, 181 Ill. App. 3d at 136, 536 N.E.2d at 941; *Pioneer Life Insurance Co. v. Woodard* (1987), 152 Ill. App. 3d 236, 241, 504 N.E.2d 230, 234.

■ Careful examination of the record on appeal indicates the findings of the ALJ were supported by the evidence. Moore and Mallory's work relationship was strained. Moore disapproved of Mallory's treatment of Blunt and spoke to Mallory about the problem on several occasions. The two men held significantly different views of the role of a supervisor, which led to additional conflict. Moore believed a supervisor should demonstrate leadership by working alongside his staff; Mallory believed a supervisor should make work assignments, monitor progress, and help when necessary.

The record also indicates Oberdalhoff and Hively did not like Mallory and did not work well under his supervision. They would not listen to his instructions and on occasion would not follow his orders. Walton testified he heard Oberdalhoff refer to Mallory as a "nigger." Oberdalhoff refused to work with black students participating in student-work programs. Oberdalhoff and Hively knew of the difficulties between Moore and Mallory, and Hively was present when Moore confronted Mallory on August 20 about his treatment of Blunt.

The ALJ did not believe Mallory would make the threats in the presence of Oberdalhoff and Hively, men he had tried to discipline and whom he believed were prejudiced against him. The ALJ also found it surprising that Moore could not remember who informed

him of the threats, particularly in view of Moore's testimony that he did not want Mallory discharged until he learned of the threats.

We conclude there was ample evidence to support the findings made by the ALJ and the findings were not against the manifest weight of the evidence. We now turn to the next issue raised by the School District, whether Mallory proved disparate treatment.

Mallory claims the School District did not terminate similarly situated white custodians, Oberdalhoff and Hively, for their insubordination in failing to follow his orders. Thus Mallory's claim is one of disparate treatment. The primary factual inquiry is whether the School District intentionally discriminated against Mallory. (*Zaderaka*, 131 Ill. 2d at 180, 545 N.E.2d at 688.) "Under the *disparate treatment* theory, proof of discriminatory motive is critical, although it may be inferred in some situations from differences in treatment. (*International Brotherhood of Teamsters v. United States* (1977), 431 U.S. 324, 335 n.15, 52 L. Ed. 2d 396, 415 n.15, 97 S. Ct. 1843, 1854 n.15.)" (Emphasis in original.) *Burnham City Hospital*, 126 Ill. App. 3d at 1003, 467 N.E.2d at 637.

■ The recent decision by the Illinois Supreme Court in *Zaderaka* presents a thorough and concise review of the analytical process courts are to use in employment discrimination cases:

"In analyzing employment discrimination actions brought under the Human Rights Act, the Commission and the Illinois appellate court have adopted the analytical framework set forth in United States Supreme Court decisions addressing claims brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e *et seq.* (1982)). [Citation.] This court will follow the same approach.

The Supreme Court set out a three-part analysis in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. First, plaintiff must establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. If a *prima facie* case is established, a rebuttable presumption arises that the employer unlawfully discriminated against plaintiff. Second, to rebut the presumption, the employer must articulate, not prove (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 259-60, 67 L. Ed. 2d 207, 219, 101 S. Ct. 1089, 1097), a legitimate, nondiscriminatory reason for its decision.

Finally, if the employer carries its burden of production, the presumption of unlawful discrimination falls and plaintiff must then prove by a preponderance of the evidence that the em-

ployer's articulated reason was not its true reason, but was instead a pretext for unlawful discrimination. This merges with plaintiff's ultimate burden of persuading the trier of fact that the employer unlawfully discriminated against plaintiff. (*Burdine*, 450 U.S. at 256, 67 L. Ed. 2d at 217, 101 S. Ct. at 1095.) This ultimate burden remains at all times with plaintiff. (*Burdine*, 450 U.S. at 253, 67 L. Ed. 2d at 215, 101 S. Ct. at 1093.)" *Zaderaka*, 131 Ill. 2d at 178-79, 545 N.E.2d at 687.

See also *Human Rights Comm'n*, 178 Ill. App. 3d at 1050, 534 N.E.2d at 172; *Acorn Corrugated Box Co.*, 181 Ill. App. 3d at 136-37, 536 N.E.2d at 940-41; *Freeman United Coal Mining Co. v. Human Rights Comm'n* (1988), 173 Ill. App. 3d 965, 973, 527 N.E.2d 1289, 1294.

■ Initially Mallory had to establish, by a preponderance of the evidence, a *prima facie* case of unlawful discrimination. The United States Supreme Court enunciated the elements for a *prima facie* case under Title VII in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817. These are:

"(1) [t]he employee is a member of a racial minority; (2) the employee was qualified for the job he was performing; (3) the employee was satisfying the normal requirements in his or her work; (4) the employee was discharged; and (5) after the em-ployee's discharge the employer assigned white employees to perform the same work." (*Pioneer Life Insurance Co.*, 152 Ill. App. 3d at 242-43, 504 N.E.2d at 235.)

Mallory was replaced by a white custodian at Baldwin.

■ "[I]n order to prove a *prima facie* case of racial discrimination involving discharge for violation of work rules, the claimant must first demonstrate by a preponderance of the evidence either that he did not violate the rules or that, if he did, white employees who engaged in similar acts were not punished similarly." (*Department of Corrections v. Clay* (1985), 135 Ill. App. 3d 710, 714, 481 N.E.2d 1080, 1083.) Stated differently, the complainant must show that similarly situated employees of a different race were treated more favorably. (*Loyola University v. Human Rights Comm'n* (1986), 149 Ill. App. 3d 8, 18, 500 N.E.2d 639, 645-46.) This standard originated in *McDonald v. Santa Fe Trail Transportation Co.* (1976), 427 U.S. 273, 49 L. Ed. 2d 493, 96 S. Ct. 2574.

■ The ALJ found as a matter of law that Mallory proved a *prima facie* case of unlawful discrimination, and the record supports this finding.

The ALJ rejected arguments that Mallory should be compared to

other custodial supervisors within the school district, rather than to Oberdalhoff and Hively. We conclude this was a sound decision as differences in titles are unimportant to the decision in this case. While a custodian and a custodian supervisor have different responsibilities, both were subject to the same discipline policy and both were expected to meet the same standard of behavior in regard to following orders. The School District also argues Mallory is not similarly situated with Oberdalhoff and Hively because his acts of insubordination were more egregious than those of Oberdalhoff and Hively. We reject this argument as well, as all three employees were insubordinate. Mallory did not follow Moore's requests to treat Blunt more gently; Oberdalhoff and Hively failed to comply with Mallory's instructions. We also note some of Mallory's treatment of Blunt was the product of Moore's interference. Moore repeatedly changed Blunt's duties without informing Mallory, thereby creating confrontations between Mallory and Blunt. Moore helped create the insubordination but then treated it differently than the insubordination of Oberdalhoff and Hively. Thus, a rebuttable presumption arose that the School District discriminated against Mallory.

To overcome the presumption, the School District had to articulate, not prove, a legitimate, nondiscriminatory reason for discharging Mallory. The School District specified insubordination and threats of violence as the reasons for Mallory's discharge. The AJL concluded the School District met its burden of articulating a legitimate, nondiscriminatory reason for discharging Mallory, though he did not believe Mallory made the threats. The presumption of discrimination was destroyed. *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687.

■ The burden then shifted to Mallory to prove, by a preponderance of the evidence, that the School District's articulated reason for terminating him was not the real reason he was fired, but merely a pretext for unlawful discrimination. "This merges with plaintiff's ultimate burden of persuading the trier of fact that the employer unlawfully discriminated against plaintiff." (*Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687.) The United States Supreme Court established this standard in *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 256, 67 L. Ed. 2d 207, 217, 101 S. Ct. 1089, 1095, stating:

> "The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional dis-

crimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."

See also *Burnham City Hospital*, 126 Ill. App. 3d at 1004, 467 N.E.2d at 638; *Acorn Corrugated Box Co.*, 181 Ill. App. 3d at 137, 536 N.E.2d at 941; *Freeman United Coal Mining Co.*, 173 Ill. App. 3d at 973, 527 N.E.2d at 1294.

The School District argues Mallory failed to meet this ultimate burden of showing pretext, as the record discloses no evidence of discrimination by Moore or Gott. The ALJ found the reasons given by the School District for discharging Mallory were pretextual. "The question of pretext is the question of whether threats were made. I do not believe the threats were made." The ALJ found Mallory more credible than other witnesses, such as Moore, Gott, Oberdalhoff, and Hively. As stated earlier, the ALJ did not believe Mallory would make threats in the presence of Oberdalhoff and Hively. And he was surprised that Moore could not remember who informed him of the threats. The ALJ found the evidence supported an inference of a racial motive in Moore's decision to discharge Mallory.

The Commission affirmed the findings and conclusions made by the ALJ:

"In his role as the fact-finder in this case, the [ALJ] simply did not believe that the complainant had threatened Mr. Moore or his secretary. Moreover, and more importantly, the [ALJ] did not believe that Mr. Moore *thought* that the complainant had made any such threats. *** We believe, however, that if the manifest weight of the evidence standard is to have any meaning, the [ALJ] must have the discretion to decide who is lying and who is telling the truth when witness testimony is in conflict. Accordingly, we find that the [ALJ's] determination that Mr. Moore was lying when he said that he believed that the complainant had made threats is not against the manifest weight of the evidence. Therefore, we must accept as fact in this case, the proposition that Mr. Moore lied to the [ALJ] about his true reason for recommending the complainant's discharge.

*** There is also some direct evidence of racial motivation which the [ALJ] could have relied upon in reaching his decision that there was discrimination in this case." *Mallory*, ____ Ill. HRC Rep. ____ (HRC No. 1985SF0090).

■ The ALJ and the Commission apparently concluded Mallory

proved pretext indirectly, by showing the School District's proffered explanations for discharging him were not worthy of credence. The findings of the ALJ, as well as the record, support this conclusion. Mallory met his burden of proving disparate treatment.

Judgment of the Commission is affirmed.

Affirmed.

GREEN, J., concurs.

JUSTICE McCULLOUGH, dissenting:

The Commission's decision should be reversed.

The majority cites certain findings of the ALJ as supported by the evidence. Those findings as cited include, Moore and Mallory's work relationship was strained; Moore disapproved of Mallory's treatment of Blunt; Moore spoke to Mallory about the Blunt problem on several occasions; Moore and Mallory held significantly different views of the role of a supervisor, which led to additional conflict; Moore believed a supervisor should demonstrate leadership by working alongside his staff; Mallory believed a supervisor should make work assignments, monitor the progress, and help when necessary. Pursuant to *McDonnell Douglas*, once the plaintiff has established a *prima facie* case of unlawful discrimination, the rebuttable presumption arises that the employer unlawfully discriminated against the plaintiff. The employer then must articulate and not prove a legitimate nondiscriminatory reason for its decision. As the majority points out, the School District specified insubordination and threats of violence as the reasons for Mallory's discharge. The ALJ concluded that the School District met its burden of articulating a legitimate nondiscriminatory reason for discharging Mallory. The presumption of discrimination was destroyed. Mallory was discharged for insubordination and also for threats which were conveyed to Moore. There is no comparison in this record with respect to any other workers at the Baldwin School who had similar charges made against them where action was not taken.

The Commission's decision should be reversed for two reasons. One, the ALJ found the School District articulated two reasons for Mallory's termination, insubordination in his treatment of Blunt and threats made by Mallory to Moore. As the majority points out, the ALJ found Mallory's only offense was insubordination. The ALJ then determined the threat reason, disputed by credible evidence of Mallory, was not justified. Insubordination as shown by the undisputed

facts in this record is sufficient cause for termination of Mallory. Thus, Mallory did not show unequal treatment in comparing his circumstances with those of Oberdalhoff and Hively. Mallory was a supervisor of custodians. Oberdalhoff and Hively were custodians.

INSUBORDINATION

The ALJ found:

> Mallory supervised custodians.
>
> Mallory would occasionally lose his temper with Blunt because of Blunt's work performance.
>
> The loss of temper would frequently involve the use of "profanity and the raising of his voice."
>
> Blunt would "often react to the verbal beratement by 'freezing' and was unable to respond."
>
> At several points during the course of the "1983-84 school year Moore talked with Mallory about his treatment of Blunt and ordered Mallory to treat Blunt more gently, not use profanity or yell at him."
>
> Later, a confrontation between Mallory and Blunt occurred August 20, 1984, involving "a loud voice and some profanity." Moore was informed by his secretary, went to the scene, took Mallory to his office, and reminded Mallory of the prior order to treat Blunt gently.
>
> Moore informed Gott of the confrontation. Gott expressed a willingness to recommend termination. Moore "demurred and explained he felt the situation did not warrant termination and that he would work it out with Mallory."

The School District did have cause to terminate Mallory in the insubordination, as articulated, and found by the ALJ. Nothing in the record indicates the Blunt problems were not real, legitimate, and properly handled by Moore. When one reads the record, Blunt may very well be the injured party.

Mallory failed to prove by a preponderance of the evidence that the legitimate reason (insubordination) offered by the School District was not a true reason for termination.

If either insubordination or threats stand as a legitimate reason, Mallory's claim must fail. That the issue of threats ignited the termination does not require a different result. Regardless of the merits of threats, the other cause for discharge, mistreatment of Blunt, stands uncontradicted. The ALJ gives credence to no threats and, on that basis, finds "pretext has been shown in that the reason for the discharge is not worthy of belief."

As stated in *Burdine*, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 67 L. Ed. 2d at 215, 101 S. Ct. at 1093.

## COMPARATORS

Oberdalhoff and Hively were custodians. Mallory was a supervisor of custodians.

The ALJ made a comparison in deciding unequal treatment. Mallory had issued a letter to Oberdalhoff with respect to Oberdalhoff's insubordination. Mallory was terminated for insubordination and Oberdalhoff was not terminated.

It is Mallory's responsibility to prove that "similarly" situated employees were not treated equally. As stated in *Acorn*, "[d]isciplining employees in different manners is probative of discrimination only if the employees are 'similarly situated,' which requires a showing of similar misconduct and similar work records." *Acorn*, 181 Ill. App. 3d at 142, 536 N.E.2d at 944.

The record shows Mallory was abusive in his language and treatment of Blunt. His conduct was called to his attention. He was directed to treat Blunt more gently because of Blunt's disability. His abusive treatment of Blunt did not end. There is no evidence of employees refusing to follow Moore's orders. There is also no evidence of similar conduct by supervisors. As stated heretofore, the failure of the School District in disciplining Mallory might well have placed the School District in violation of Blunt's rights. There is no showing by Mallory of unequal treatment of similarly situated employees. Mallory did not sustain his burden.

The decision of the Human Rights Commission should be reversed.